IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ALBERTO TREJO, AIS# 2664352    )
                               )
     Plaintiff,                )
                               )
vs.                            )    CIVIL ACTION NO. 21-390-TFM-B
                               )
WARDEN REOSHA BUTLER, *et al.,*    )
                               )
     Defendants.               )

## REPORT AND RECOMMENDATION

Plaintiff Alberto Trejo, an Alabama prison inmate proceeding without an attorney, filed a complaint under 42 U.S.C. § 1983.[1] This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). (Doc. 21). This matter is before the Court on Defendants' motion for summary judgment. (Doc. 123). For the reasons discussed herein, it is ordered that this motion be **DENIED**.

## I.    Background and Factual Allegations

Trejo is suing Defendants Warden Reosha Butler, Officer Raymond Blackmon,[2] Captain Willie Knight, Officer John Henry Jones, Warden Antonio McClain, Lieutenant Brandon McKenzie, Captain

---

[1]    This action was initially filed in the United States District Court for the Middle District of Alabama (see Doc. 1) but was transferred to the Southern District of Alabama after Trejo filed an "amendment to complaint," which was construed as an amended complaint. (See Docs. 16-20).

[2]    Trejo's complaint refers to Officer Raymond Blackmon as Carl Blackmon.

Johnny McNeal, Captain James Smith, and Lieutenant Dexter Wright[3]
for failing to protect him from an inmate attack that occurred on
September 21, 2021, while he was housed in the restrictive housing
unit (RHU) at Fountain Correctional Facility ("Fountain"). Trejo
alleges that he repeatedly informed Defendants that the Crip gang
had placed a monetary hit on his life after being labeled a snitch
and asked to be placed in a single-man cell, but Defendants failed
to move him or protect him and this failure resulted in him being
stabbed roughly 27-times in his back and left arm and once in his
abdomen, with an item like an ice pick.

### A. Complaint Allegations.

Trejo alleges that prior to his arrival at Fountain on April
4, 2021, he was labeled a snitch while incarcerated at Kilby
because I & I agents, a DEA agent and ADOC employees singled him
out for questioning during a shakedown at Kilby. Trejo contends
that because of this encounter, he was labeled a snitch at Kilby.
(Doc. 50 at 4-5). According to Trejo, when he arrived at Fountain,
he was "greeted" by several Crip gang members. (Id. at 4). Trejo
contends that he was extorted by the gang members because of the
"snitch" label that attached to him due to the Kilby incident. (Id.
at 4-5). Trejo alleges he paid the Crip gang, weekly, for
protection until their requests became more demanding, and he

---

[3]   Trejo's complaint refers to Lieutenant Dexter Wright as
Darren Wright.

stopped paying. (Id. at 5). He further alleges that on August 2, 2021, several of the gang members "pulled out shanks" and "jumped" him while he was going to take a shower. (Id. at 5). Trejo escaped from the shower and reported the incident to Lieutenant Wright.

Trejo alleges that Lieutenant Wright called him "a wetback Mexican Snitch", that an argument ensued between the two, and that this attracted the attention of Captain Knight, who was standing nearby. (Id.). Trejo asserts that he relayed to Captain Knight the problems he was having with the Crip gang members, including extortion by the gang and a monetary hit that the gang had put on his life. According to Trejo, Lieutenant Wright placed him in a chain-link fence cage and then, at 7:00 p.m., he took Trejo to the segregation/protection unit, or RHU. (Id.). Trejo contends that as Lieutenant Wright escorted him to the RHU, Lieutenant Wright said that "that he didn't give a [_]uck if the Crips killed the Plaintiff, the only reason [Trejo was being taken to the RHU is because] he did not want a riot to break out if the Plaintiff was killed." (Id.). Trejo alleges that he asked Lieutenant Wright to place him in a single-man cell in the RHU because of the monetary hit the Crip gang had placed on his life, but his request was denied, and he was placed with a cellmate. (Id. at 6).

Trejo contends that from August 2 to September 21, 2021, while housed in the RHU, he received death threats through "scribes" – paper notes that are sent by inmates to deliver messages. (Id.).

According to Trejo, he was constantly told that a hit was on his life by the Crip gang, and he was warned that "he was never going to make it away from [Fountain or any Alabama prison] alive." (Id.). Trejo claims he repeatedly communicated these threats and a fear for his life to Defendants, including:

- He sent daily inmate request slips to Wardens Butler and McClain, Captains Knight, McNeal, and McKenzie, and Lieutenants Smith and Wright begging and requesting to be housed in a single cell or transferred to another facility because he "fear[ed] for his life with a hit being placed on his head/life by the Crip gang, and still further receiving threats in seg/protective custody unit." (Id. at 6).

- He asked Officers Blackmon and Jones (who worked the RHU) on a daily basis to place him in a single cell because of the Crip gang had placed a hit on his life because they believed he was a "snitch and C.I. agent", and they were continuing to send him threats, messages through scribes while in the RHU. (Id. at 6, 22-23).

- He verbally informed the segregation board, including Warden McClain, Captain Knight, Captain McKenzie, Lieutenant Smith, and Lieutenant Wright, on their weekly rounds, that he was still receiving death threats by the Crip gang members and because of the hit placed on his life by the Crip gang, he feared for his life being in the cell with another inmate. (Id. at 6).

- He advised Officer Blackmon, at the time he placed Inmate Gates in his cell, on September 18, 2021 (three days after the previous cellmate was moved), that having a cellmate put his life in danger because of the Crip gang's hit on his life, and Officer Blackmon responded "that he didn't give a damn if his new cell mate killed him and informed the Plaintiff his cell arrangements was by order of [Warden Butler.]" (Id. at 7).

- He asked Officer Jones, following the shift change, to "move the Crip associate out of the cell" and stressed to him that "the Crips had a monetary hit placed on his

head/life," and Officer Jones "teased the Plaintiff by saying to [Inmate Gates] . . . 'you ain't fixing to do nothing to this cry baby wetback'" and left before Inmate Gates could give an answer. (Id.).

On September 21, 2021, approximately three days after Inmate Gates was placed in Trejo's cell, Inmate Gates stabbed Trejo approximately 27 times in the back, stomach, and sides with an inmate-made ice pick while Trejo was sleeping. Trejo was taken by ambulance to a local hospital emergency room where it was determined that he had a punctured left lung. (Id.).

According to Trejo, while at the hospital, two investigators questioned him about Gate's attack on him, and one of the agents referenced the Kilby incident and asked Trejo if "he [was] ready yet to talk to the DEA agent that was at Kilby." (Id. at 7-8). Trejo was later told by Lieutenant Davis "that the inmate who stabbed him confessed he was trying to collect the money on the Plaintiff's head/life by the Crip gang." (Id. at 8).

Trejo has asserted Eighth Amendment claims against all Defendants for failing to protect him and for a lack of security in the protective custody unit, as well as gross negligence. (Id. at 9-30). Trejo seeks monetary damages or whatever relief the Court sees fit. (Id. at 31).

**B. Defendants' Answer and Special Report.**

Defendants deny violating Trejo's constitutional rights. (Docs. 74, 77). Each defendant has submitted a personal affidavit which is summarized below:

> Warden Butler asserts that she never received any Inmate Requests slips or any form of communication from inmate Trejo. She further asserts that she never had any discussions with Trejo about a known "hit" on his life. She also denies that she received any reports from staff regarding known threats or danger related to Trejo's safety. (Doc. 74-5).

> Warden McClain asserts that Trejo never advised him that he was in fear for his life before the assault on him. He further asserts that he did not receive verbal or written requests from Trejo to be placed in single cell. (Doc. 74-6).

> Captain Knight asserts that on Aug. 2, 2021, Dexter Wright advised him that Trejo was "having a problem adjusting in the Fountain general population"; thus, he instructed Wright to place Trejo in the restrictive housing unit. Trejo was later placed on the transfer list by the restrictive housing review board. (Doc. 101-1).

> Captain McKenzie asserts that Trejo never wrote him requesting to be moved into an individual cell in the RHU. Nor did Trejo ever "speak with [him] directly about the accusations [now raised against him in this complaint]." (Doc. 74-7 at 1-2). The only encounter Captain McKenzie recalls having with Trejo was during cell searches in the RHU. Captain McKenzie contends he was never made aware of any alleged "hit" that the "Crip" gang placed on Trejo. He further asserts that at least one correctional officer was always assigned to each restrictive housing unit on a 24-hour rotating basis during the time span at issue. (Doc. 74-7).

> Captain McNeal asserts that at the time of the incident alleged in Trejo's complaint, he was the Security Threat Group Coordinator, and his only encounter with Trejo was completing the Security Threat Group assessment of him. (Doc. 77-2).

> Lieutenant Smith asserts that he has no recollection of an incident involving Trejo. (Doc. 77-3).

6

Lieutenant Wright asserts he has no knowledge of any gang members planning an attack on Trejo while he was assigned to Fountain. He also asserts he has no knowledge of anyone placing a hit on Trejo while he was incarcerated at Fountain. (Doc. 123-1).

Officer Blackmon asserts that on September 18, 2021, he "conducted a security check and notified inmate Trejo that Inmate Gates would be placed in Cell #C1-25 with him." According to Officer Blackmon, Trejo stated, "I'm cool with that", and never told him anything about fearing for his life. (Doc. 77-1)

Officer Jones asserts that Trejo did not advise him of a monetary hit on his head by the "Crip" gang or that he feared for his life. He further contends that Trejo never asked him to move Inmate Derrione Gates out of their shared cell. Jones also denies teasing Trejo or referring to him as a "cry baby wetback." (Doc. 74-8).

In support of their positions, Defendants have also produced evidence related to Gates' stabbing of Trejo on September 21, 2021, including the Incident and Duty Officer Reports, body charts, medical records, and the LESD Investigative Report that followed the September 21, 2021 attack. (See Docs. 74-1 through 74-8).

**C. Motion for Summary Judgment.**

**1. Defendants' Motion for Summary Judgment.**

Defendants assert that "Trejo's allegations state only that he feared Crip gang members in general from the moment he arrived at Fountain" and that his allegations fall short of establishing deliberate indifference. (Doc. 123 at 9; Doc. 50 at 4). Relying on

the Eleventh Circuit's decisions in Carter[4] and Johnson,[5] Defendants maintain Trejo's failure to express a *particularized* fear of his attacker to any Defendant, besides Officer Jones, is fatal to demonstrating the subjective intent of Defendants. (Id. at 10). Defendants also point to Daniels[6] in asserting that Trejo

---

[4] In Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003), the plaintiff, who was attacked by his cellmate, alleged that the defendants were liable because they knew of his cellmate's "well-documented history of prison disobedience" and that his cellmate "had been prone to violence." Id. at 1349. On appeal, the court found that this knowledge, coupled with the plaintiff's various complaints regarding his cellmate acting "crazy [and] roaming his cell like a caged animal" fell short of demonstrating a "particularized threat or fear." Id. at 1349-50. The court also noted the plaintiff never told prison officials that his cellmate clearly threatened him, and he never made a request for protective custody.

[5] In Johnson v. Boyd, 701 F. App'x 841 (11th Cir. 2017), the plaintiff sued after he was attacked by his cellmate, who had a known propensity for violence on inmates, staff, and himself. The court found knowledge of these "tendencies" was insufficient and that deliberate indifference "requires more than a mere awareness of an inmate's generally problematic nature." Id. at 845 (alteration omitted). Moreover, the court noted that prior to the attack, the plaintiff had never requested protective custody or informed the defendants that the cellmate threatened him.

[6] In Daniels v. Felton, 823 F. App'x 787 (11th Cir. 2020), the plaintiff sued after the defendants allowed unauthorized inmates with gang affiliations to enter and attack him and his cellmate, who was affiliated with a rival gang. The plaintiff argued that the prison was a dangerous place and a gang fight had occurred two months earlier. On appeal, the court found that the plaintiff failed to identify any risk of harm known to the defendants beyond the generalized danger of housing rival gang members in the same prison. Specifically, the plaintiff did not know the inmate attackers, had no prior problems with them, and he did not present evidence of any specific prior conflict between his cellmate and the attackers either. Id. at 790.

had no prior problems with Gates, and when Gates was placed in his cell, Trejo responded, "'I'm cool with that' to Officer Blackmon." (Doc. 123 at 10-11). Additionally, Defendants suggest that because Inmate Gates had no prior disciplinary infractions before the attack, they did not consider him to be a threat to Trejo. (Id. at 11).

For these reasons, Defendants Butler, McClain, McKenzie, Blackmon, McNeal, Smith, Knight, and Wright argue that they lacked the subjective awareness needed to establish deliberate indifference. (Id). Alternatively, Defendants assert they are all entitled to qualified immunity from Trejo's claims.

### 2. Trejo's Response in Opposition.

Trejo has responded in opposition to Defendants' motion for summary judgment, reasserting the allegations in his verified complaint and affirming the same by personal affidavit. (See Doc. 131; Doc. 131-1 at 3-5). In support of his response, Trejo also submitted affidavits and declarations of fellow inmates, two ADOC incident reports, and a place holder page for an audio recording of ADOC's Law Enforcement Services Division ("LESD") investigation into the stabling incident involving Trejo. (See generally Doc. 131-1; Docs. 125, 126).

### 3. Defendants' Reply to Trejo's Response.

Defendants reiterate that Trejo has failed to allege that Defendants were informed of a *particularized threat.* (Doc. 132).

Defendants maintain Trejo's allegations represent general fears of the Crip gang and are insufficient to establish deliberate indifference – that "[w]ithout notice of a particularized threat posed by Gates, none of the Defendants could draw the necessary inference that Gates posed a substantial risk of serious harm to Trejo." (Id. at 4-5).

This motion has been fully briefed and is ripe for consideration.

## II.  Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis in original) (citation omitted).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant can

meet this burden by presenting evidence showing there is no dispute
of material fact, or by showing or pointing out to the district
court that the nonmoving party has failed to present evidence in
support of some element of its case on which it bears the ultimate
burden of proof. Id. at 322-24, 106 S. Ct. 2548.

> Once the moving party has met its burden, Rule 56(e)
> "requires the nonmoving party to go beyond the pleadings
> and by [its] own affidavits, or by the 'depositions,
> answers to interrogatories, and admissions on file,'
> designate 'specific facts showing that there is a
> genuine issue for trial.'" To avoid summary judgment,
> the nonmoving party "must do more than show that there
> is some metaphysical doubt as to the material facts." On
> the other hand, the evidence of the nonmovant must be
> believed and all justifiable inferences must be drawn in
> its favor.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp.
2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted).

The requirement to view the facts in favor of the nonmoving
party extends only to "genuine" disputes over material facts.
Garczynski, 573 F.3d at 1165. "A genuine dispute requires more
than 'some metaphysical doubt as to the material facts.'" Id.
(citations omitted). A "mere scintilla" of evidence is
insufficient; the nonmoving party must produce substantial
evidence in order to defeat a motion for summary judgment. Id.
"[I]f the record taken as a whole could lead a rational trier of
fact to find for the nonmoving party," then a genuine issue of
material fact exists. Hickson Corp. v. Northern Crossarm Co., Inc.,
357 F.3d 1256, 1260 (11th Cir. 2004). In addition, "[t]here is no

burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## III. Discussion and Analysis

### A. Immunity Defenses.

Defendants have asserted immunity defenses. To the extent Defendants are being sued in their official capacities, as a correctional officers, they are considered employees of the State and are immune from suit pursuant to the Eleventh Amendment, which bars "suits against a state brought in federal court by citizens of that state." <u>Harbert Int'l, Inc. v. James</u>, 157 F.3d 1271, 1277 (11th Cir. 1998). "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment." <u>Id</u>. (citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 166-67 (1985)). Accordingly, the correctional officer defendants in this action, all of whom were employed by the State of Alabama Department of Corrections at

the time of the incidents alleged in the complaint, are immune from suit in their official capacities. See Parker v. Williams, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989), overruled on other grounds in Turquitt v. Jefferson Cnty., 137 F.3d 1285 (11th Cir. 1998) ("[S]uits against an official in his or her official capacity are suits against the entity the individual represents."). Thus, the officer defendants, in their official capacities, are entitled to summary judgment as a matter of law.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  There is no dispute here that the defendants in this action were acting within their discretionary authority at all times when the acts in question occurred. Accordingly, the officer defendants are entitled to qualified immunity unless Plaintiff can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. See Belcher v. City of Foley, Ala., 30 F.3d 1390, 1395 (11th Cir. 1994). Therefore, the Court will now address whether this action identifies any constitutional violation.

13

**B. Failure to Protect.**

Under the Eighth Amendment, prison officials have a duty to "ensure reasonable safety" of inmates, "a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." Farmer v. Brennan, 511 U.S. 825, 844-45 (1994). However, "a prison custodian is not the guarantor of a prisoner's safety", Purcell ex rel. Morgan v. Toombs Cnty., 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted), and "[i]t is not[] every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. Prison officials must "take reasonable measures to guarantee the safety of the inmates", Hudson v. Palmer, 468 U.S. 517, 526-27 (1984), but there is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not. . . ." Farmer, 511 U.S. at 838. It is a defendant's deliberate indifference to a known, significant risk that violates the Eighth Amendment. Lane v. Philbin, 835 F. 3d 1302 (11th Cir. 2016).

"A prison official violates the Eighth Amendment 'when a substantial risk of serious harm, *of which the official is subjectively aware*, exists and the official does not respond

reasonably to the risk.'" Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (emphasis in original) (citation omitted). To survive summary judgment on a failure-to-protect claim, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam) (quotation omitted).

Defendants base their motion for summary judgment on the second element — the prison official's deliberate indifference to a substantial risk of serious risk. This element "has both a subjective and an objective component." Marbury v. Warden, 936 F3d 1227, 1233 (11th Cir. 2019). "To satisfy the subjective component, a plaintiff must produce evidence that the defendant 'actually (subjectively) knew that an inmate faced a substantial risk of serious harm.'" Caldwell, 748 F.3d at 1099 (citation and alterations omitted). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. To meet the objective component, a plaintiff must produce evidence that the defendant disregarded the known substantial risk by failing to respond to it in an objectively reasonable manner. Caldwell, 748 F.3d at 1099. "The known risk of injury must be 'a strong likelihood, rather than a mere possibility'

15

before a [prison official's] failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (citations omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983[.]" Id.

Turning to the present case, Defendants' assertion that Trejo is required to "express[] *a particularized fear of Derrione Gates*" to establish the subjective element of deliberate indifference is misplaced. The law is clear that "an official may not escape liability merely by showing that he did not know the claimant was likely to be assaulted or that an assault would be committed by the specific prisoner who eventually committed the assault." Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1583 (11th Cir. 1995) (citing Farmer, 511 U.S. at 843). Instead, the question to be asked, as set out above, is whether prison officials had knowledge of facts sufficient to make them aware that Trejo faced a substantial risk of serious harm. See Marbury, 936 F.3d at 1236.

The Eleventh Circuit has clarified that where an expressed fear is not directed at a specific inmate, such as is the situation here, officials must possess enough details about a threat to enable them to conclude that it presents a 'strong likelihood' of injury, not a 'mere possibility.'" Id. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including

inference from circumstantial evidence. <u>Farmer</u>, 511 U.S. at 842. Thus, "a [court] may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Id</u>. For instance, courts have found that threats of harm for being labeled a "snitch" can be specific enough to warrant investigation or protection, without an inmate identifying a specific, individual "enemy" rather than an entire gang. *See* <u>Martin v. Weber</u>, No. CV DLB-22-922, 2024 WL 1329295, at *10-12 (D. Md. Mar. 28, 2024) (collecting cases). In such cases, a plaintiff "must present evidence of a particularized fear based upon prior threats or upon members of a specific group who have the motive and the ability to commit an assault themselves or through intermediaries." <u>Id</u>. at *10, quoting <u>Wolf v. Tewalt</u>, No. 1:21-CV-00226-DCN, 2021 WL 5132423, at *8 (D. Idaho Nov. 3, 2021). For threats from gangs to be considered "particularized," courts generally require the plaintiff to identify a reason for being targeted. <u>See</u> <u>Rodriguez v. Sec'y for Dep't of Corrections</u>, 508 F.3d 611, 619 (11th Cir. 2007) (holding that where inmate told a corrections officer on at least two occasions that "he feared a gang member might kill him" after he renounced membership in the gang and requested a transfer on that basis, there was a genuine issue of material fact on the officer's subjective knowledge); <u>Martin</u>, 2024 WL 1329295 at *12 (finding the plaintiff's expressed his fear that he would be hurt or killed by the Bloods because he was a snitch sufficient to

survive summary judgment); Douglas v. Annuci, No. 14-CV-6018 CJS, 2017 WL 5159194, at *6 (W.D.N.Y. Nov. 7, 2017) (concluding the plaintiff plausibly pleaded a substantial risk of serious harm where the complaint alleged that there was "an active 'contract' on his life by the Bloods gang, and that he has already been slashed by Bloods gang members on five occasions.").

The factual allegations made by Trejo are more akin to those present in Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611 (11th Cir. 2007), rather than the facts in the Carter, Johnson, and Daniels cases relied on by Defendants. In Rodriguez, a prisoner informed prison staff that members of his former gang had threatened to kill him if he was released into the general prison population. Rodriguez described specific information about the threats to prison officials, by which they could have reasonably inferred that there was a substantial, not merely possible, risk of harm. For this reason, the Eleventh Circuit distinguished Rodriguez from Carter, stating:

> Here, unlike in Carter, Rodriguez told [Officer] Johnson the following specific information: (1) that he was a former Latin King who decided to renounce his membership; (2) that members of the Latin Kings had threatened to kill him when he returned to the compound in retaliation for his renunciation; (3) that the compound at ECI was heavily populated with Latin Kings; and (4) that, in order to prevent an attempt on his life, he needed either to be transferred to another institution or to be placed in protective custody. These are the things that the inmate in Carter did not do. A reasonable juror could find from this evidence that Johnson actually knew that Rodriguez faced a substantial risk of serious harm.

18

Rodriguez, 508 F.3d at 621-622. The Eleventh Circuit reaffirmed this "key distinction" in Marbury, noting "a vague statement like 'I have a problem with another inmate in this compound,' absent some information 'about the nature of the anticipated risk,' would not have created a genuine issue of fact regarding deliberate indifference to a substantial risk of serious harm." Marbury, 936 F.3d at 1237. Indeed, to rise to the level of deliberate indifference to a substantial risk, a plaintiff must go beyond expressing a "vague statement" and must communicate something "about the nature of the anticipated risk[.]" Id.

Here, Trejo alleges that he was labeled a snitch by the Crip gang, that the Crip gang extorted him for months for protection, that the Crip gang "jumped" him before he was taken to the RHU for protection, that the Crip gang put a monetary hit on his life for being a snitch, that he continued to receive threats from the Crip gang while housed in the RHU, and that he informed every defendant of these facts and requested to be transferred or housed alone because of the hit put on his life by the Crip gang. Accepting Trejo's allegations as true, a reasonable juror could find that Trejo informed the defendant officers of a threat to his safety from which the official(s) could have reasonably inferred that he faced a substantial, not merely possible, risk of harm. Stated another way, Trejo's allegations present a particularized fear,

rather than a vague statement. The fact that Defendants categorically deny Trejo's allegations that he informed them of a fear for his safety or that they had knowledge of a hit placed on his life creates a question of credibility and demonstrates that there remain genuine issues of material facts.[7]

At this stage of the action, it is not the function of the reviewing court to weigh the evidence and determine the truth of the matter; rather, it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 252; Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co., 802 F.2d 1352, 1356 (11th Cir. 1986) ("[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary

---

[7]   To the extent Defendants attempt to assert that they somehow responded reasonably to a known risk, the record has not been fully developed at this juncture. Notably, Defendants suggest that because Inmate Gates had no previous disciplinary infractions, there was no reason to suspect that he posed a particularized threat to Trejo who allegedly had a hit placed on his head. (Doc. 123 at 11; see also Doc. 74-4 at 2). The record, however, is void of evidence to suggest that any Defendant based any housing decision on such information *before* Inmate Gates was placed in the cell with Trejo. (See generally Docs. 74-5, 6, 7, 8; 77-1, 2, 3; 101-1; 123-1). While, notably, Officer Blackmon asserts he "conducted a security check" before Inmate Gates was placed into Trejo's cell, the record lacks any information (much less testimony based on personal knowledge) as to what this check entailed or its findings. (See Doc. 77-1). Accordingly, no evidence exists to support what actions Defendants took or information they knew before placing Inmate Gates into the RHU cell with Trejo.

Contrarily, Trejo alleges he repeatedly asked to not be housed with Inmate Gates and that Inmate Gates later admitted to stabbing Trejo to collect the money offered by the Crip gang. (Doc. 50 at 8).

judgment must be denied.")); <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1227 (11th Cir. 2004), <u>cert. denied, De Armas v. Kingsland,</u> 543 U.S. 919 ("The plaintiff's word is merely countered by the defendants' testimony. Given the standard of review at the summary judgment stage, we must accept [Plaintiff's] version of the facts as true.) (citing <u>Rowe v. City of Fort Lauderdale</u>, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002)). Instead, because Trejo's version of the facts is not blatantly contradicted by the record, it must be accepted at this procedural stage of the action. <u>Sears v. Roberts</u>, 922 F.3d 1199, 1208 (11th Cir. 2019) ("As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature.") (citation omitted).

Accordingly, the parties have presented evidence of a factual dispute that may only be determined by a trier of fact; thus, it is recommended that Defendants' summary judgment motion be denied.

### IV. Conclusion.

Based on the foregoing, the undersigned **RECOMMENDS** that Defendants' motion for summary judgment (Doc. 123) be **DENIED.**

The instructions that follow contain important information regarding objections to the report and recommendation of the Magistrate Judge.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. ALA. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate

Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the **3rd** day of **June, 2024.**

_____
                          **/s/ SONJA F. BIVINS**
                    **UNITED STATES MAGISTRATE JUDGE**